# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
## October 18, 2011 Session

## STATE OF TENNESSEE v. JEROME SIDNEY BARRETT

### Appeal from the Criminal Court for Davidson County
### No. 2007-D-3201    Steve R. Dozier, Judge

_____

### No. M2010-00444-CCA-R3-CD -Filed July 18, 2012

_____

The Defendant, Jerome Sidney Barrett, was found guilty by a Davidson County Criminal Court jury of first degree murder for the 1975 homicide of S.D.  See T.C.A. § 39-2402 (1975) (amended 1977, 1979, 1988) (renumbered at § 39-2-202) (repealed 1989).  He was sentenced to life in prison.  On appeal, he contends that:  (1) the evidence was not sufficient to support the conviction; (2) the trial court erred in denying his motion to suppress evidence; (3) the trial court erred in denying the motion to dismiss the indictment pursuant to State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), and alternatively, in failing to instruct the jury regarding the lack of an autopsy report; (4) the trial court erred in admitting evidence for which the chain of custody was not sufficiently shown; (5) the trial court erred in admitting an inmate's testimony about the Defendant's prior statements and improperly redacting the statements; (6) the trial court erred in admitting altered photographs; (7) the trial court limited the Defendant's ability to present a defense by failing to rule definitively that evidence of the Defendant's other crimes was inadmissible; (8) the trial court erred in denying the defense motion for expert services to assist in the motion for new trial; and (9) the Defendant's due process rights were violated by the cumulative effect of the errors.  We affirm the judgment of the trial court.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed

JOSEPH M. TIPTON, P.J, delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and JEFFREY S. BIVINS, JJ., joined.

Patrick G. Frogge (on appeal), Nashville, Tennessee; Marjorie A. Bristol (at motion for new trial and on appeal), Hendersonville, Tennessee; and G. Kerry Haymaker and David R. Heroux (at trial), Nashville, Tennessee, for the appellant, Jerome Sidney Barrett.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; Tom Thurman, Leticia Alexander, and Rachel Sobrero, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The victim's older brother testified that in 1975, he and the victim attended Vanderbilt University. He said the victim previously studied at Eckerd College in Ocala, Florida, where she lived in a "communal" house with several men and women. He said that in February 1975, she lived in an apartment building near Vanderbilt.

He testified that at about 11:00 p.m. on February 2, 1975, he accompanied his father to the victim's apartment. He said they had not heard from the victim in a couple of days, which was unusual. He said the apartment was dark. The victim's body was on the bed and she was nude except for a blouse. Her face was "a little discolored." He said his father checked for breath and a pulse and attempted to resuscitate the victim, then told him to call the police. He said his father covered the victim's body with a comforter. He said that neither he nor his father otherwise disturbed the apartment while they waited for the police to arrive.

On cross-examination, he could not recall if they entered the apartment using a key or if he was present when his father spoke with Officer Finchum. He said that to the best of his recollection, the comforter was not in the same location when they arrived as depicted in a photograph exhibit. He conceded that he did not remember whether he or his father placed the comforter on the victim's body. On redirect examination, he said his sister had been in good health.

Thales Finchum testified that he was a retired Metro Police officer and was working as a patrol officer on February 2, 1975. He and his partner responded to a call from the victim's apartment. He said they arrived at 11:29 p.m. and met the victim's brother in the courtyard of the apartment complex, who led them to the victim's apartment. He said that the victim was on the bed, covered with a blanket, and that the drawers were pulled out of the furniture. They checked for the victim's pulse but found none. He said he went to the door to control access to the apartment. He said that neither he nor his partner wore gloves at the scene and that wearing gloves was not a common practice at the time.

On cross-examination, Mr. Finchum testified that it was cold and rainy on the night he responded to the scene. He said he made a list of people who entered and left the crime scene and gave it to the homicide detectives when he left. He said that the victim's

apartment was unlocked when he arrived and that the victim's brother claimed to have entered with a key. He said that other than the drawers and the bed clothing, nothing was in significant disarray in the apartment.

George Trammel "Tram" Hudson testified that he attended Vanderbilt University in February 1975. He said that the victim worked at a dormitory near the one in which he lived and that he took her on a date on February 1, 1975. He said they saw a movie, went to a music club called Mississippi Whiskers, and went to a fraternity party. He said he took her home about 1:30 a.m. He bought Milk Duds at the theater. He thought they had about three beers and some popcorn at the club, although he said he would defer to his statement given the week of the crime. He said that they arrived at the fraternity party around 11:40 p.m. and that they had "a couple of drinks" and danced. He said that it was hot and that around 12:30 a.m., the victim felt queasy. He said they went outside, where the victim vomited. He said that as he drove the victim home, he had to stop for her to vomit a second time. He acknowledged that the victim might have been "tipsy," but he did not think she was drunk. He said she was lucid and could talk.

Mr. Hudson testified that when he picked up the victim for the date, the door to the apartment house was "wide open." He said he went to the victim's third-floor apartment and knocked. He said that he waited in her apartment while she made a telephone call and that they played with her dog before leaving. He said that the victim explained that a neighbor watched the dog when the victim was working on campus at night and that the dog ran inside the neighbor's apartment when the victim opened the neighbor's door. He said he did not notice any injuries on the victim. He said she wore a white or beige cotton pull-over blouse with embroidery on the chest. He was shown a blouse and identified it as being consistent with the victim's blouse. He recalled that the victim was wearing a London Fog raincoat and that he carried an umbrella that night. He said that when they returned to the victim's apartment house, she assured him that she was able to walk up the stairs alone. He said this was the last time he saw the victim, sometime after midnight on Sunday.

Mr. Hudson testified that he was awakened in his dormitory room on Monday morning by two policemen and a university official, Dean Steve Caldwell. He said they informed him of the victim's death. He said he went to the police station, gave a detailed statement about the previous twenty-four hours, and cooperated fully with the authorities.

On cross-examination, Mr. Hudson testified that according to his prior statement, he asked the victim on a date on Tuesday, January 28, 1975. He said he arrived at the victim's apartment at 6:30 p.m. He agreed the apartment was "old and run down" and described it as "seedy." He did not recall an elevator. Although he did not have any recollection of it, he acknowledged his previous statement that the apartment house door was open, that the

mailboxes looked as if they had been vandalized, and that there was "jovial" noise coming from another apartment. He did not recall if the victim unlocked her door for him. He said the victim's apartment was furnished in the "shabby chic" style that looked as if it were from a secondhand store. He said he did not enter the victim's bathroom or bedroom. He said the victim smoked cigarettes on their date. He said the victim was adamant about paying for her movie ticket but only had a few coins and gave him seventy-five cents.

Mr. Hudson testified that they arrived at Mississippi Whiskers around 9:45 or 10:00 p.m. He said that there was a mixture of students and other people at the club and that his previous statement described some of the people there as "hard core freaks." He agreed that the victim drank three dark beers at the club, that he had two dark beers and one light beer, and that they each had three mixed drinks at the fraternity party. He said the victim's apartment was a five to ten minute drive from the fraternity house. He acknowledged that he steadied the victim as she leaned out of his car to vomit and as she walked to the front door of her apartment house. He said the victim mumbled apologies. He agreed the victim had her raincoat draped over her arm. He said he watched the victim walk up a few steps and assumed she made it to her apartment. On redirect examination, Mr. Hudson said that in his opinion, the victim was okay to be alone. He said the telephone call the victim made earlier that evening was to a shoe repair business.

Lynn Redding testified that she and her brother shared an apartment in Nashville in February 1975. She said the apartment building had four floors and no elevator. She lived on the third floor. She said the victim moved into the apartment next door around Christmas 1974. She said that she and her brother had a friendly, neighborly relationship with the victim and that the victim gave her a key to the victim's apartment in order to feed the victim's dog. She said she kept the victim's dog on occasion. She said the victim's door had a push-button lock that could be opened with a key.

Ms. Redding testified that she used the victim's telephone on February 1, 1975, to order pizza for herself, her brother, and a friend. She said the victim asked her to keep the dog that day. She did not see any bruises on the victim when the victim brought the dog to her. She said she never saw the victim in poor health. She recalled having been in the victim's apartment a few days earlier when the victim was changing clothes but did not observe any bruises.

Ms. Redding testified that she went to the victim's apartment in the mid-morning hours of February 2, 1975, to get food for the victim's dog. She said the victim had not come to get the dog, although the victim usually did so when she returned home. She saw the victim's coat on the banister and took it inside the victim's apartment. She said she passed by the bedroom on her way to the kitchen and saw the profile of the victim's face. She

thought the victim was asleep. She did not know if the victim was in bed. She said the bedroom was dark with only a little light coming through the shades. She said that the victim's dog ran to the victim and that as she left the kitchen, she saw the dog slink out of the room, walk close to the ground, and whine. She said the dog usually appeared happy and jumped for attention when he saw the victim. She said she locked the victim's apartment and returned with the dog to her own apartment. She could not recall if she returned to the victim's apartment later that day. She acknowledged, though, that she needed to return to get more dog food and said she did not notice anything different in the victim's apartment when she returned. She said she always locked the door when she left the victim's apartment.

On cross-examination, Ms. Redding testified that she did not know the victim until the victim moved into the apartment building. She said that on February 1, 1975, she watched television with her friend, Ben Blanton, and that her brother came home from work later that evening. She said that they went into the victim's apartment more than once that night and that one of the trips was to look for a corkscrew, which they did not find. She said her brother might have taken a screwdriver from the victim's apartment to open a bottle of wine. She recalled that they opened the wine with a screwdriver and a hammer. She said they left the victim's apartment immediately after using the telephone to place the pizza order. She said that to her knowledge, no one else was in the victim's apartment when she entered it that evening. She agreed that she did not see anything in disarray when she went inside the victim's apartment the next morning. She acknowledged that she returned to the victim's apartment at 2:00 p.m. on February 2 for more dog food. She said she unlocked the door with her key every time she went into the apartment.

On redirect examination, Ms. Redding testified that the apartment building had thick, concrete walls. She said that noise from another apartment had to be exceptionally loud to be heard in her apartment. She agreed she did not see any bruises or injuries when the victim brought the dog to her on February 1. On further recross-examination, Ms. Redding agreed that the victim was fully clothed when she brought the dog to her.

Benjamin Blanton testified that he was the victim's high school classmate. He said that in February 1975, he was living with his parents in Nashville while he was "off duty" for the winter from his blacksmith job in New Hampshire. He said that he visited the Fussells at the victim's apartment building on February 1, 1975, but that he did not see the victim that night. He said he left the Fussells' apartment well after midnight and possibly after 1:00 a.m. He said he knocked tentatively on the victim's door. He said that it was dark and quiet and that he assumed that if the victim were home, she was sleeping. He did not see anything unusual. He said Detective Pridemore contacted him about 7:00 the next morning.

On cross-examination, Mr. Blanton agreed that he and one or both of the Fussells went to his father's home in West Nashville. He recalled that someone went to the victim's apartment to search for a corkscrew on February 1, but he could not recall who. He acknowledged that if his statement given in 1975 reflected that he went inside the victim's apartment, it was probably accurate. He could not recall whether they found a corkscrew but remembered trying unsuccessfully to open the bottle using a screwdriver. He said they may have opened the bottle with the screwdriver later. On redirect examination, Mr. Blanton said he was positive he would not have pulled out the dresser drawers and other drawers to search for a corkscrew.

James Sledge testified that he was an assistant district attorney general but was employed with the Metro Police Department Identification Division in early 1975. He described the difference between present crime scene investigation and such investigation in 1975 as "like daylight and dark with the seventies being dark." He said that HIV, AIDS, and DNA were unknown in 1975 and that the police did not use gloves to collect evidence at the time. He said they simply tried to be careful when securing and packaging evidence in 1975. He said he would have worn a standard police uniform when collecting evidence then.

General Sledge testified that he and Officer Tommy Burke worked together on the night of February 2, 1975, and that they responded to the scene. He recalled that it was raining and "messy." He said the apartment building was brick and was probably a house that had been subdivided into apartments. He described the victim's apartment as a third-floor walk-up on the top floor. He said there was a stairway in the middle of a hallway with apartments on both sides, forming an "H" shape. He identified Officers Finchum and Ford as the first responders and said Detective McKinsey may have been present. He said that at the time of the trial, Detective McKinsey was deceased, Mr. Burke was alive, and to the best of his knowledge, Mr. Ford was still alive. He said that protocol at the time was for the detective to instruct the identification unit officers in their duties at the scene.

General Sledge identified a diagram he drew, which was received as an exhibit. He said it was not to scale but contained measurements taken by Officer Burke. He said the drawing depicted the bedroom as larger than it was. He said that rolls of film containing pictures from major crimes were placed in manila envelopes with the complaint number, control number, location, date, and time. He said the envelopes were taken to the police department and placed in a tray for laboratory technicians to develop. He said the Metro Police Department was one of the first police departments in the country with a color photograph laboratory. He identified photographs of the crime scene taken by Officer Burke. He said that after receiving the developed photographs from the laboratory technicians,

Officer Burke would have stamped the back with a Metro Police stamp and would have written the complaint number, report number, and the officer's name.

General Sledge identified photographs taken at the scene and noted that there were two prints of some of them, one printed in 1975 and one printed recently. He agreed that all of the photographs fairly and accurately depicted what he saw on February 2, 1975. He identified a back door leading to a fire escape in the victim's apartment. He said he checked the door and found it locked and dead-bolted. He noted a pair of blue jeans hanging on a chifforobe or chest of drawers. He identified a photograph of a pair of panties near a basket and on a footlocker. He noted a pair of shoes that appeared to have been "kicked around or tossed around or something" because they were not together. He noted that the victim was on top of a quilt and covered by a comforter. He identified a window above the bed and said it faced an alley beside the building. He said all of the victim's windows were locked. He said the photographs depicted an abrasion and redness on the victim's face and a bruise on her arm.

General Sledge testified that he and Officer Burke removed the victim's coverings in layers in order to collect, bag, and label the evidence. He said the victim was wearing a blouse or pajamas but was not wearing underwear or pants. He said they removed the victim's clothing and examined her body for trauma but found none. He noted the settling of blood on the back of her shoulders and what appeared to be dried blood on a sheet that had been below the comforter and blanket.

General Sledge testified that lividity was an indicator of a body's position at the time of death. He said this was significant because it indicated whether the body was moved after death. He identified the white comforter and his handwriting on the evidence bag containing it. He said each item of evidence was tagged separately. He said he repackaged the comforter in Fall 2008 because the original bag was falling apart. He identified other items that he and Officer Burke collected at the scene: a pillow and pillowcase, a quilted bedspread, a gold-striped blanket, a striped bed sheet, a pair of blue jeans, a fraternity song or poem from the right rear jeans pocket, and a brown coin purse from the left rear jeans pocket. The coin purse contained a list of names and gifts, various identification cards issued to the victim, a McDonald's certificate, and the victim's bank book. He said no money was recovered from the victim's apartment. He recalled searching a handbag and looking for containers of coins at the scene. He also identified the victim's blouse or pajama top and a pair of panties that he collected. He said they dusted for fingerprints, and he identified the cards containing the fingerprints lifted from the scene.

General Sledge testified that after collecting the evidence, they would have taken it to the office, stapled and secured the bags, attached the property cards, and taken them to the

property room. He stated that on some occasions there would not be anyone in the property room due to personnel issues and that if this were the case, the evidence was locked in a closet in the booking room until the next morning when the property room staff arrived. He did not recall whether he and Officer Burke took the evidence to the property room immediately or to the booking room first.

General Sledge testified that at the time of the victim's death, bodies were transported by funeral homes. He said that Nashville did not have forensic pathologists at the time and that bodies were examined by three medical doctors. After the victim's body was transported, he met Dr. John Petrone, the medical examiner, at the hospital. He said that hairs were pulled and cut from the body, fingernail scrapings and clippings were collected, and a pubic hair combing was performed. He identified the evidence and the identifying markings that he and Officer Burke made. He thought the evidence was examined separately by the TBI and FBI.

On cross-examination, General Sledge testified that he and Officer Burke were the only identification unit officers at the scene that day. He agreed that when he arrived at the scene, the victim was wearing a blouse, black socks, a bracelet, and a watch. He identified a pair of socks, tan shoes, a watch, and a bracelet that he collected. He said the socks were bagged separately, but the watch and bracelet were bagged together. He agreed he did not wear gloves when he bagged the items. He did not recall collecting evidence from any room other than the bedroom. He was shown photographs but could not recognize them as depicting the victim's apartment. He identified other photographs of the hallway entry to the victim's apartment. He recalled dusting for fingerprints at the entrance from the hallway to the victim's apartment and thought he also dusted near the bed. He recalled that Officers Finchum and Ford were posted at the door to keep people away from the crime scene. He recalled Detective McKinsey, himself, and Officers Burke, Finchum, and Ford as the only people present. He said that some officers who were involved in the investigation later were now deceased.

Metro Police Identification Analyst Linda Wilson testified as an expert in latent print analysis and comparison. She said her job duties included maintaining the department's latent print files and entering them into the Automated Fingerprint Identification System ("AFIS"). She said a person would not always leave fingerprints after touching something. She said a "known print" was a print taken in a controlled environment from a known subject. She said the analysis of prints involved comparing a latent print with a known print to determine if they were made by the same person. She said that if a match were determined, a second verification would be performed by a supervisor or other qualified analyst. She said that matches were not always possible due to factors such as insufficient ridge detail, transfer of a substance to an object, or wearing gloves, and that it was not

unusual for no usable prints to be found. She said elimination prints were taken to eliminate subjects who were known to have been at a crime scene.

Ms. Wilson testified that she analyzed the prints recovered from the crime scene but conceded she never visited the scene or spoke with the officer who collected the prints. She said she found usable prints but was unable to make an identification. She said the prints were never compared to elimination prints from the officers on the scene, the victim, the victim's family, neighbors, or friends. She said the prints were compared to those of the Defendant and other suspects. She said the prints were not the Defendant's.

Edward Berwitz, an expert in hair and fiber analysis, testified that he was a contract employee of the FBI and that he was previously employed in the FBI laboratory and as an instructor at the FBI Academy. He said that in 1975, hair examination involved viewing hairs collected as evidence with known samples using a microscope. He said he could determine from this type of analysis one of three racial characteristics of the person, the part of the body the hair was from, if the hair was forcibly removed or shed naturally, if the hair had been "artificially" treated, and if it was suitable for analysis. In his opinion, the type of hair analysis conducted in 1975 was still valid.

Mr. Berwitz testified that he was working in the FBI laboratory in February 1975 and that he analyzed evidence collected in the investigation of the victim's death. He said that he did not perform fiber analysis but that fibers were removed from the items and placed in bottles for future analysis. He said he found forcibly removed Negroid head hairs on a blanket, a sheet, and blue jeans. He found Negroid pubic hairs on a blanket, a sheet, blue jeans, a bedspread, and the victim's pubic hair combings. He found Caucasian head hairs on a blanket and a sheet and determined that they were dissimilar to the victim's head hair sample. He found head hairs that were consistent with the victim's known sample on two blankets, two sheets, a bedspread, a pillow and pillowcase, a second pillow, blue jeans, and panties. He said he was provided with known samples of hair from only the victim.

Mr. Berwitz testified that it was possible for a person's hair to be at a crime scene even though the person had not been. He said hair is sometimes transferred from one person to another and then deposited at a crime scene. He said that after he completed his testing, the evidence was packaged and returned to Nashville.

On cross-examination, Mr. Berwitz conceded that he did not remember if he opened the package of evidence in this case and that it was typically a technician's job to open a package and inventory the items. He said he received the evidence on February 25, 1975. He said that blood analysis would have been performed by the laboratory's serology unit and

that testing for semen would have been done by someone else. He did not recall whether he or a technician packaged the evidence and returned it to Nashville.

The victim's step-mother testified that the nineteen-year-old victim had no known health issues. She said the victim moved to the apartment where she died a few weeks before her death. She said the victim attended Vanderbilt University for one semester and attended Eckerd College in Florida before that. She said the victim took things from the family home when she left for college, including a white comforter. She said the victim shopped for clothing and household goods at thrift stores and garage sales. She said that she and the victim's father provided the victim with financial assistance and that the victim's mother did so occasionally. She identified a photograph of the victim taken when the victim was a high school senior.

The victim's younger brother testified that he was sixteen years old and a patient at a psychiatric hospital when the victim died. He said he had a drug abuse problem. When asked how his DNA from his semen could have been on a comforter from his home, he said, "I was a young man with young man desires." He said he visited the victim at her apartment once or twice.

Ann Ramsey testified that she lived with the victim and two other women in 1974 and that one of the women's boyfriends stayed there sometimes. She agreed it was an "open house" with people coming and going. She said they did not lock the doors when they were away because others were living at the house. She said the victim's favorite places to shop for clothing and household items were thrift stores.

Ms. Ramsey testified that she visited the victim's apartment and that they went to North Carolina together during Christmas break. She said a male friend of the victim stayed at the victim's apartment over the break. She said that the victim had a boyfriend in 1974 and that she went with the victim to visit him in August. She was not aware of the victim's dating anyone in Nashville. Ms. Ramsey said she saw the victim two days before the victim's death and did not notice any injuries or bruises.

On cross-examination, Ms. Ramsey testified that Betty Wood was one of the women who lived with the victim and her in 1974. She did not recall telling the police that a person from California named Greg lived with them. She remembered telling the police that Ms. Wood's boyfriend, Willard Shriver, lived with them. She acknowledged her previous statement to the police that the victim usually removed her pants and slept in her shirt and that the victim sometimes slept in socks, but she did not recall making the statement. On redirect examination, she acknowledged the possibility that Greg from California was the person who stayed at the victim's apartment.

Ralph Langston, a retired Metro Police officer, testified that he interviewed the Defendant in March 1975. He said he also went to the Defendant's apartment, which was a few miles from Vanderbilt University.

Bill Pridemore testified that he was a retired Metro Police detective. His last assignment was the Cold Case Unit, which was formed in February 2002. He said that the case of the victim's homicide was reviewed in 1992 by Detective Brad Putnam but that no evidence was submitted for testing. He said there was no CODIS database of DNA profiles in place when Detective Putnam reviewed the case. He said that he reviewed the case during his assignment to the Cold Case Unit and determined that untested evidence might contain DNA. He identified items he submitted to the TBI for testing: a blouse, a white comforter, a pillow and pillow case, a quilt, a yellow striped blanket, a striped bed sheet, another sheet, panties, hairs and pubic hair combings, and fingernail clippings and scrapings. He acknowledged that he did not send the blue jeans to the TBI. He said he attempted to locate slides containing hair and fibers that had been recovered by the FBI in 1975 but was unable to do so, even though he had several conversations with the FBI about the slides. He said there were no records that the slides were returned to the property room.

Mr. Pridemore testified that after the TBI identified DNA from the evidence he submitted, the process became one of using known profiles to eliminate family members, the victim, and others. He said the DNA of Ben Blanton, a convicted felon who was known to have been in the building or nearby at the time of the crime, was excluded using the CODIS database.

Mr. Pridemore testified that the Defendant was developed as a person of interest and that he was able to determine that the Defendant spoke with police officers on the Vanderbilt campus on December 20, 1974, and February 12, 1975. He said he located the Defendant in Memphis and served a search warrant for DNA samples. He said that the Defendant read the search warrant, which named the victim and stated the facts of the case, and that the Defendant said, "That one ain't me." He collected samples of the Defendant's DNA using two sterile swabs on the inside of the Defendant's mouth. He said that the Defendant inquired about the next step in the process, that he told the Defendant, "[Y]ou'll never see us again" if the sample did not match the evidence, and that the Defendant replied, "Well, then, I'll never see you again."

Mr. Pridemore testified that two hairs recovered from a blanket were tested. He acknowledged that there were hundreds of hairs on the blanket but said that testing was very expensive and the budget did not allow for testing hundreds of hairs. He said the tested hairs did not match the Defendant's hair sample. He said it was not unusual for hair to be found

at a crime scene that had nothing to do with the crime. He said that hair on a blanket would be less significant than hair in a victim's mouth or on a victim's body.

Mr. Pridemore testified that after the Defendant was arrested in Memphis and held in jail in Nashville, the Defendant's telephone calls were recorded. He said that each inmate was given a personal identification number ("PIN") for their transactions, including telephone calls. He said that if an inmate had not yet been assigned a PIN, he or she might use another inmate's PIN to place calls. He said that initially, no recordings were found for the Defendant's PIN. They searched using telephone numbers that the Defendant might call, however, and found the recordings. He said the calls were to Michelle "Chell" Knight.

On cross-examination, Mr. Pridemore testified that the blanket with hundreds of hairs was the only item of evidence with a large quantity of hair. He said it was a thick, Indian style blanket. He said the TBI removed the two hairs that were tested. He said the hairs were from different individuals.

Dr. Bruce Levy, the Tennessee Chief Medical Examiner and Davidson County Medical Examiner, testified as an expert witness in forensic pathology. He said that in 1975, the state's only forensic pathologists were in Memphis. He said forensic pathology was a relatively new sub-specialty at the time. He said that Dr. Petrone was a physician but not a forensic pathologist.

Dr. Levy testified that a medical examiner determined cause of death and manner of death by relying on such factors as information about the scene where the person was found, the decedent's medical records and history, the autopsy, and laboratory tests. He said that he reviewed the following items with regard to the victim's death: the death certificate and medical examiner's report prepared by Dr. Petrone, photographs taken at the scene, police reports, laboratory reports, and newspaper clippings. He said Dr. Petrone's report stated the victim's height as 5'3" and her weight as 108 pounds. He said her blood alcohol content was 0.07% and that her blood was negative for barbiturates, a commonly abused class of drugs at the time. An examination of the stomach contents revealed ethyl alcohol of 0.08%. Drug screens of the stomach contents and liver were negative. He said the amount of alcohol in the victim's system was not dangerous. He said that Dr. Petrone classified the victim's cause of death as asphyxia and her manner of death as undetermined. He said that Dr. Petrone was quoted in several police reports and media accounts as saying that he could not determine whether the victim was suffocated or whether she had a spasm of her stomach contents into her larynx. He said that at the time, it was commonly believed that a person could choke to death on vomit. He said, however, this had been proven to be untrue. He said the only way a person could choke to death was if a solid object were lodged in the airway. Dr. Levy agreed with Dr. Petrone's determination of the cause of death as asphyxia. He said it was

difficult to tell, however, if the victim was suffocated, strangled, or both. He noted the presence of injuries to both the face and neck. He stated his opinion that the manner of death was homicide. He said that an asphyxiated person would lose consciousness in seconds to a minute and that it would take another couple of minutes for death to occur.

Dr. Levy testified that he enlarged one of the photographs of the victim in order to see her injuries better. Referring to the photograph, he noted bruising and an abrasion to her face and petechiae, or fine pinpoint hemorrhages, on her forehead. He said these injuries were not present earlier in the evening of the victim's death. He also noted injuries on the victim's neck, which he said raised the question of strangulation. He said that there was a linear scratch on the victim's right breast and that she had a rare double crescent injury on her right arm that might represent a bite, although he was unable to determine if it was. He also noted a scratch on the lower part of the victim's neck and chest near the collarbone. He estimated that the victim's time of death was between the time she was last known to be alive and the following morning when a neighbor came to her apartment.

Dr. Levy testified that he searched unsuccessfully for an autopsy report for the victim. He had no doubt that an autopsy was performed. He said that Davidson County, Shelby County, and Nashville General Hospital records were searched. He said that a police supplemental report mentioned retrieving specimens from an autopsy but that the funeral home had no records that could be searched. Likewise, Dr. Petrone's family was not able to find anything in Dr. Petrone's practice records. He said the absence of the report in both the state and county records should not have been acceptable in 1975.

On cross-examination, Dr. Levy testified that he was employed by a private corporation that had contracts with the county and state for medical examiner services. He said that the corporation performed autopsies for several counties in Middle and West Tennessee and that Shelby and Davidson counties provided a large portion of their work. He agreed that he relied on the assumption that the victim was a healthy nineteen-year-old girl. He also agreed that he relied on documentary evidence in the victim's case and described the autopsy process he would follow for a body received in his office. He acknowledged that a police report stated that an officer went to a funeral home and retrieved specimens from the victim's brain, liver, bile, stomach contents, hair, and blood. He said that in 1975, some autopsies were performed for the medical examiner by a pathologist at Nashville General Hospital. He said it would have been uncommon even in 1975 for no autopsy report to be generated. He conceded that his determination of the manner of death was not as conclusive as it would be with an autopsy report. He said the toxicology report stated that the stomach contents and liver were negative for "drugs of abuse." He acknowledged that current drug screens included testing for drugs for which testing was not done in 1975. He agreed that when the Department of Health performed testing at least two decades earlier, its policy was

to destroy documents after two years. He said that although it was not typical for forensic pathologists to rely on newspaper articles, he relied in this case on a specific quote from the medical examiner in a newspaper article.

On redirect examination, Dr. Levy testified that a person might have a reaction to a specific type of alcohol and that food consumed while drinking would have an impact on alcohol absorption. He said that a person who was not drinking could become sick from dancing in a hot environment. He agreed heat could cause vomiting, as could a combination of alcohol, no food, and heat. He said that in determining the victim's manner of death, he considered her facial injuries and body position. He said that according to a scientific study, the majority of perpetrators of asphyxiation deaths received injuries from their victims and that eight percent of the perpetrators had scratches from their victims' fingernails. He said the presence of semen could be considered but was not determinative of whether death was a homicide. He said that given the scientific exclusion of the possibility that the victim could have choked on her own vomit, the only logical conclusion was that her manner of death was a homicide.

On recross-examination, Dr. Levy acknowledged his previous testimony in the victim's case that the identity of the person whose semen was found would influence his opinions of cause and manner of death. He agreed that as new drugs were abused, there was a window of time in which laboratory tests were not yet developed to detect them. He agreed that in the absence of a complete toxicology report, the presence of drugs or drug paraphernalia would be relevant. On further redirect examination, Dr. Levy testified that his consideration of the crime scene was related more to the body than to the scene itself.

Davidson County Sheriff's Investigator Michelle Ray testified that her job duties included monitoring and tracking jail inmates' telephone calls. She said that an inmate must enter a PIN to make a telephone call and that the call must be accepted by the person receiving the call. She said there was a recorded message announcing that the call was from the facility or the agency and stating the inmate's name. She said that aside from privileged conversations, all calls were recorded. She said that records were kept about the location of inmates within the cells.

Investigator Ray testified that in November 2007, Detective Pridemore asked her to search for telephone calls with the Defendant's PIN. She did not find any recorded calls and asked Detective Pridemore to give her telephone numbers the Defendant might call. She searched for these numbers and found attempted calls but no recorded calls. She said she searched using the PIN that was used for the attempted calls and found other calls that were recorded. She said the PIN was assigned to Derrick Moore, who came to the jail around the same time as the Defendant and who "kind of went through the early parts of the process at

the same time." She said that at one point, the Defendant was in cell 4C and Mr. Moore was in cell 3A. She acknowledged that inmates sometimes shared their PINs but did not know the frequency. She identified CDs containing a recording and a shortened recording of a call made to (901) 737-1454 at 20:50:11 on November 24, 2007. The recording was played for the jury. In it, a recording announced a collect call from Derrick Moore, a Davidson County inmate. The Defendant talked to an unidentified male and a woman named Jackie. The unidentified male referred to the Defendant as Jerome. The Defendant stated his opinion that as soon as he was given a lawyer, the case "will fall apart." He said that his DNA excluded him as the perpetrator and that he did not know the victim or anything about the case. He said the police were talking about pubic hairs because his DNA did not match. He said that when he was served with the search warrant for his DNA, he was told that the police were getting DNA from twelve to fifteen people. He claimed he read the search warrant and provided his DNA because he was not the perpetrator of the crime. He said, "this is something they rigged up on this cold case concept." He claimed he was "secreted" from Memphis without an arrest warrant. He claimed he was named as a suspect because he had been in Nashville around the time of the crime but said he was unsure whether he was there because he did not know the date the crime occurred.

Detective Bill Pridemore was recalled and testified that he listened to at least fifty or sixty telephone calls and became familiar with the Defendant's voice. He said he spoke with the Defendant in person, as well. He said he recognized the Defendant's voice on the recording.

TBI Special Agent Chad Johnson testified as an expert in forensic science and DNA analysis. He said the TBI began conducting RFLP DNA analysis in 1993, PCR DNA analysis in 1996, and STR DNA analysis in 1998. He said the TBI was an accredited agency, which involved following quality guidelines and allowing monitoring of the laboratory. He said that employees were required to have proper, ongoing training and that the facility and individual work areas must be secured. He said that conclusions made by the agents were subjected to thorough peer review and administrative review before they were reported and that further analysis might be done in the case of disagreement about the conclusions.

Special Agent Johnson testified that every person's DNA was unique, except for identical twins. He said that the laboratory analyzed DNA from blood, semen, and saliva. He said that items of evidence were first subjected to presumptive tests to determine whether bodily fluids were present, and if so, the type of fluid. If a bodily fluid was detected, a confirmatory test was performed by placing a portion of the item on a slide and viewing the slide under a microscope. He said that after this testing, DNA was extracted from the material by cutting the area, placing it in a tube, washing the cells from the material, and washing the DNA from the cells. He said the extracted DNA might be copied through an

amplification process in order to obtain the target amount for analysis. Finally, the DNA was analyzed to determine its profile. He said that comparing DNA profiles required comparison of thirteen loci from each sample and that all thirteen loci must match in order to be considered a DNA match.

Special Agent Johnson testified that he received evidentiary items from the victim's case at various times. He identified the items: the victim's blouse, a blanket, a comforter, a pillow, a striped sheet, a white sheet, a quilt, a pillow and pillow case, panties, fingernail clippings, blood samples, and swabs. He said the blood samples were from Paul Slaton, John Watkins, the victim's younger brother, and Mark Trouvillion. The swabs were from Ben Blanton, the victim's father, and the Defendant. He said a unique case number was used to identify the evidence while it was in the laboratory. He explained the protocol for receiving, storing, and transferring evidence within the laboratory.

Special Agent Johnson identified his October 23, 2008 report, which was received as an exhibit. He said that most of the evidence he received was not ideal for DNA testing due to its age and small quantity but that there was a sufficient amount to test. He said that the comforter contained sperm, that the DNA was consistent with that of the victim's younger brother, and that the possibility of it matching someone else was more than one in six billion. He said that the pillowcase contained semen but that it was an insufficient sample for comparison and that there were two female profiles from a chemical found in saliva. One was identified as most likely being the victim's based upon comparison with the victim's father's DNA standard. He characterized this as a "half-match" and noted that the victim's deceased mother's DNA was unavailable. He said there was semen from an unknown male and a chemical from the victim's saliva on the pillow that accompanied the pillow case.

Special Agent Johnson testified that he received the Defendant's swabs on October 29, 2007, and that he had already examined the other evidence at this point. He said that the Defendant's DNA profile matched that found on the quilt and that the probability of another person having the same DNA profile exceeded the world population. The same was true of DNA from semen on the striped blanket. He said that at Detective Pridemore's request, he collected hairs from the striped blanket that became detached during the testing, although the normal policy of the laboratory was not to collect hairs from evidence. He said many hairs remained on the blanket. He said the striped sheet contained semen that was a partial DNA match to the Defendant. He said that he was able to match three of the thirteen loci and that the probability of another person having a profile that matched the same three loci was one in 6600 in the African-American population, one in 5500 in the Caucasian population, one in 16,000 in the Southeastern Hispanic population, and one in 19,000 in the Southwestern Hispanic population. He said there was a second partial profile that was consistent with the victim's DNA profile.

Special Agent Johnson testified that the white sheet contained semen and human blood. He said that the blood stain contained both a male and a female profile and that neither was consistent with the known profiles he received. He obtained a partial profile from the semen, which he said was consistent at five loci with the Defendant's DNA sample. The probability of another person having the same profile was one in 560,000 in the African-American population, one in 490,000 in the Caucasian population, one in 2.6 million in the Southeastern Hispanic population, and one in 4.5 million in the Southwestern Hispanic population. He was "almost certain" a larger stain toward the bottom of the sheet was from the victim's losing bladder control at the time of death, although he did not perform any testing to verify this. He noted that the stain aligned with other layers of bedding that were underneath the body. He said that "H.R. Jones" and "HRJ" were written on the sheet. He said he did not have a known sample from someone with that name. He said it was possible for DNA to survive laundering.

Special Agent Johnson testified that he identified semen with the Defendant's complete DNA profile on the victim's blouse. He said the possibility that another person had the same DNA profile was one in a number that exceeded the world's population. He said that he was not able to find any semen on the victim's panties but that he obtained a limited female DNA profile that was consistent with a better profile from the pillow that he assumed was the victim's. He said the victim's fingernail clippings first revealed a very limited partial profile but in a second test revealed two profiles. The larger profile was consistent with the Defendant's DNA, and the smaller was consistent with the DNA from the pillow that was presumed to be the victim's. He said the probability that another person had the same DNA profile was one in over six billion. He said that typically, the victim would be the larger contributor of DNA to fingernail clippings evidence. He said a total of six items of evidence contained DNA with a profile consistent to the Defendant's. He said that for four of the six items, the chance of someone other than the Defendant having the same DNA profile was one in more than the world's population.

Sheldon Anter, a jail inmate, testified that he had been convicted of worker's compensation fraud and had a theft charge. He said the Defendant and he had been housed together. He recalled the Defendant's claim that "[the Defendant] killed that–uh– Vanderbilt girl and that he didn't know why he killed her and that he needed some help." He said Frank White was also present during this conversation. Mr. Anter said that about a week later, he and the Defendant were on the roof during recreation time when the Defendant said that if Mr. Anter mentioned anything about their previous conversation, the Defendant would kill him.

Mr. Anter testified that he witnessed an argument between the Defendant and Andrew Napper. He said that Mr. Napper admonished the Defendant for changing the television's

channel and that the men argued. Mr. Anter said that Mr. Napper went into the Defendant's cell and that the Defendant told Mr. Napper to leave before he killed him. He said that the argument continued and that the Defendant said he had no problem killing because he had killed before. Mr. Anter testified that he also witnessed an argument between the Defendant and Mr. White, during which the Defendant said he had murdered before and had no problem murdering Mr. White.

Mr. Anter acknowledged that he did not immediately approach the police with the information. He said the police came to him about one or one and one-half weeks after the Defendant's statements. He acknowledged that he did not remember the victim's college at the time of the investigation. He said he mentioned TSU and MTSU during the investigation but later told an officer he was 100% certain the statement was about a Vanderbilt student. He was certain the statement was about a college student.

Mr. Anter testified that his trial in his workers' compensation case was on November 17 and 18, which was after he gave his statement to the authorities. He said the State did not "help" him or promise him anything in that case.

The trial court instructed the jury that if it found that the Defendant made threats not related to this case, the evidence could not be used against the Defendant in determining the issues in the present case. On cross-examination, Mr. Anter testified that the Defendant stated several times that he had killed before and was willing to kill again. Mr. Anter said that when the Defendant made the statement inside the cell, another inmate had come into the cell. On redirect examination, Mr. Anter testified that he did not know what the officers wanted to discuss when he was taken from his cell to the homicide office.

Metro Police Detective Hugh Coleman testified that he was assigned to the Homicide Cold Case Unit when he interviewed Mr. Anter in August 2008. He said he initiated contact based upon his investigation, not a request by Mr. Anter. He said that as Mr. Anter left the interview, Mr. Anter said he thought the college student went to Vanderbilt. The jury was instructed that this statement was not substantive proof and should be considered only as it related to Mr. Anter's credibility.

The Defendant did not offer proof. The jury found the Defendant guilty of first degree murder and imposed a life sentence. This appeal followed.

# I

## SUFFICIENCY OF THE EVIDENCE

The Defendant contends that the evidence is not sufficient to support his conviction. The State counters that the proof is sufficient. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

At the time of the offense, pertinent to the Defendant, first degree murder was the unlawful "willfull, deliberate, malicious, and premeditated killing" of another. T.C.A. §§ 39-2401 (1975) (renumbered at § 39-2-201) (repealed 1989) (murder), 39-2402 (1975) (amended 1977, 1979, 1988) (renumbered at § 39-2-202) (repealed 1989) (first degree murder). The Defendant argues that his conviction should be reversed and dismissed due to the missing autopsy report, breaks in the chain of custody of items tested at the TBI laboratory, lack of proof of mens rea, and reasonable doubt of his identity as the perpetrator.

Viewed in the light most favorable to the State, the record reflects that the victim died from asphyxiation. Although Dr. Petrone was unable to determine the manner of death, he determined that the cause of death was asphyxiation and that the victim either was strangled or choked on vomit. Based upon scientific evidence developed after Dr. Petrone rendered his opinion, Dr. Levy eliminated choking on vomit as the means of asphyxiation. Dr. Petrone also noted that the victim's injuries were consistent with strangulation. He said that it would take between a few seconds to one minute for a block in a victim's airway to render them unconscious and that a perpetrator would have to continue for another couple of minutes to cause death. There was evidence that the victim fought her attacker, and a substantial amount of the Defendant's DNA was identified from her fingernail clippings. The Defendant made admissions to other inmates that he killed a Vanderbilt student but did not know why he did it and needed help and that he had killed before and would kill them. Police officers spoke with the Defendant on the Vanderbilt campus on December 20, 1974, and February 12, 1975, although the Defendant lived miles from the campus. The victim was killed in her apartment near the Vanderbilt campus on February 2, 1975. The presence of

semen and the victim's injuries suggested that the victim was sexually assaulted. The Defendant's DNA profile was identified on the victim's quilt, striped blanket, blouse, and nail clippings. A partial match to the Defendant's DNA profile was also identified on two sheets from the victim's bed. Semen containing the Defendant's DNA was on the victim's blouse and some of the bedding. The evidence is sufficient to support the jury's finding that the Defendant was the perpetrator of a willful, deliberate, malicious, and premeditated killing. Cf. State v. Melvin Crump, No. M2006-02244-CCA-R3-CD, Davidson County (Tenn. Crim. App. Mar. 18, 2009) (affirming conviction of first degree murder under statute requiring proof of willful, deliberate, malicious, and premeditated killing in case involving death by strangulation), app. denied (Tenn. Aug. 24, 2009). The Defendant is not entitled to relief.

## II
## MOTION TO SUPPRESS

The Defendant contends that the trial court erred in denying his motion to suppress the evidence obtained pursuant to a search warrant for his DNA sample, which matched DNA evidence in this case. The Defendant contends that the affidavit used to obtain the warrant contained insufficient information to establish probable cause. He contends that the court should have suppressed the DNA evidence as the fruits of an unconstitutional search and seizure. The State contends that the affidavit stated sufficient facts to establish probable cause, that the warrant was properly issued, and that the trial court properly denied the motion to suppress. We agree with the State.

In Tennessee, a finding of probable cause supporting issuance of a search warrant must be based upon evidence included in a written and sworn affidavit, which sets forth sufficient facts upon which a neutral and detached magistrate can find probable cause for issuing the warrant. T.C.A. §§ 40-6-103, -104; Tenn. R. Crim. P. 41(c); State v. Jacumin, 778 S.W.2d 430, 432 (Tenn. 1989); State v. Bryan, 769 S.W.2d 208, 210 (Tenn. 1989). The need for the magistrate's independent judgment means that the affidavit must contain more than merely conclusory allegations by the affiant. "Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police." United States v. Ventresca, 380 U.S. 102, 108-09 (1965).

In determining the validity of a search warrant, the reviewing court may consider only the information brought to the magistrate's attention. Jacumin, 778 S.W.2d at 432. The affidavit may be based on hearsay information and need not reflect the direct personal observations of the affiant. Id. When relying on information from an informant, the affiant must be able to demonstrate that the informant has a basis of knowledge and that he is

credible or the information is reliable. See id. at 436 (adopting the two-prong test of Aguilar v. Texas, 378 U.S. 108 (1964), and Spinelli v. United States, 393 U.S. 410 (1969)); State v. Lewis, 36 S.W.3d 88, 98 (Tenn. Crim. App. 2000). As a practical matter, when the affiant is an investigating officer, his or her reliability may be presumed by the magistrate, as may be the reliability of other investigating officers upon whom the affiant relies. See State v. Moon, 841 S.W.2d 336, 338 n.1 (Tenn. Crim. App. 1992). Thus, no special showing of reliability is necessary when the information comes from such an officer. Id.

In Jacumin, the supreme court warned against applying the two-pronged test hypertechnically. 778 S.W.2d at 436. It also approved, as it previously had in Bryan, the United States Supreme Court's statement in Illinois v. Gates relative to the duties of magistrates and reviewing courts regarding the determination of probable cause:

> The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

Gates, 462 U.S. 213, 238-39 (1983).

A finding of probable cause made by an issuing magistrate is entitled to great deference. State v. Yeomans, 10 S.W.3d 293, 296 (Tenn. Crim. App. 1999). Therefore, the standard to be employed in reviewing the issuance of a search warrant is "whether, in light of all the evidence available, the magistrate had a substantial basis for finding probable cause." State v. Meeks, 876 S.W.2d 121, 124 (Tenn. Crim. App. 1993).

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). The application of the law to the facts as determined by the trial court is a question of law which is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The affidavit states:

> Personally appeared before me, Det. Bill Pridemore and made oath that he had good ground and belief, and does believe that [the Defendant] is in possession of the following described property, to wit, human DNA sample of the following described individual, to wit: the person of [the Defendant] . . . and his reasons for such belief is: On February 2nd, 1975, [S.D.] was found murdered by Asphyxia in her apartment located at 911 20th Ave. South Nashville, Tn. During the investigation it was determined that the victim was sexually assaulted in the early morning hours. Evidence from the sexual assault including but not limited to negroid pubic hairs and semen was collected and examined. Investigators interviewed the last person known to be with [S.D.] who states during the early morning hours of February 2nd 1975 he dropped [S.D.] off in front of her apartment building located at 911 20th Ave. South Nashville, Tn. and drove away. During the time frame of her death there was a rash of rapes and sexual assaults occurring in the same general area where the victims [sic] body was located. The pattern of the assaults consisted of female white's [sic] being assaulted in their dorm rooms or apartments. The suspect would enter through an unlocked door and would forcibly rape the victim. March of 1975, one month after the death of [S.D.], [the Defendant] was arrested and charged with committing at least two of the rapes and one attempted rape in the vicinity of [S.D.'s] residence. He was later tried and convicted in Davidson County Criminal Court Nashville, Tn. for rape. During the investigation [the Defendant] made a statement implicating himself. In this statement Mr. Barrett stated in the early morning hours he would enter the buildings attempting to find unlocked apartment doors. Once entering the apartment he would forcibly rape the victims. All of the victims were young female whites who appeared to be alone.

The Defendant argues that the affidavit does not connect him to the victim's homicide, that the affidavit merely describes the perpetrator as "M/B" and alleged that Negroid pubic hairs were recovered at the scene, that the only information directly related to the Defendant is the allegation that he was charged with two rapes and an attempted rape in 1975 in the area of the victim's home, and that he was convicted of only one count of rape for those charges.

He claims this information failed to provide a substantial basis for concluding that execution of the warrant would provide evidence of wrongdoing. As the State notes, the affidavit was required only to establish probable cause to believe the Defendant committed the offenses, not prove that he was the perpetrator.

Upon review, we conclude that the magistrate properly found probable cause for samples of the Defendant's DNA to be collected and that the trial court did not err in denying the motion to suppress. The affidavit states that the victim was sexually assaulted and asphyxiated, that there had been a series of rapes and sexual assaults in the victim's neighborhood around the time of the crimes, that the Defendant was arrested a month after the victim's death and charged with three of the neighborhood attacks, that the Defendant gave an inculpatory statement that was consistent with the modus operandi of the attacks, and that the Defendant was convicted of rape. These allegations provided a factual basis for inferring that the sexual assault and homicide of the victim were similar to the other crimes because they occurred in the same geographic location, involved similar victims, involved sexual assaults, and were accomplished using the same general modus operandi. In addition to these facts supporting the inference that the crimes were committed by the same person, the affidavit alleges that the Defendant was the same race as the person whose pubic hairs were found at the scene. Considered together, the facts support inferences that the Defendant was the perpetrator of the other crimes, and therefore, the crimes involving S.D. We conclude that the affidavit provided a sufficient basis for the magistrate's probable cause finding. The Defendant is not entitled to relief.

### III

### AUTOPSY REPORT

The Defendant contends that the trial court erred in denying the motion to dismiss the indictment pursuant to State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), and alternatively, in failing to instruct the jury regarding the lack of an autopsy report. The State responds that the trial court did not abuse its discretion in denying the motion to dismiss the indictment and the motion for a special jury instruction. We agree with the State.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, section 8 of the Tennessee Constitution affords every criminal defendant the right to a fair trial. See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). Accordingly, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to the defendant's guilt or innocence or to the potential punishment faced by a defendant. See Brady v. Maryland, 373 U.S. 83, 87 (1963).

With regard to lost or destroyed evidence, our supreme court has stated that the critical inquiry in determining the consequences that flow from the State's loss or destruction of evidence which the accused contends would be exculpatory is whether "a trial, conducted without the destroyed evidence, would be fundamentally fair[.]" Ferguson, 2 S.W.3d at 914. The analysis begins with determining whether the State had a duty to preserve the evidence. Id. at 917. If the State had a duty to preserve the evidence and failed in that duty, the court should consider the following factors in determining the consequences of that error: (1) the degree of negligence involved, (2) the significance of the lost or destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available, and (3) the sufficiency of the other evidence used at the trial to support the conviction. Id. If the trial court determines that a trial without the missing evidence would not be fundamentally fair, then the trial court may dismiss the charges or craft such orders as may be appropriate to protect the defendant's right to a fair trial. Id. Review of a trial court's ruling on a motion to dismiss the indictment is for abuse of discretion. State v. Harris, 33 S.W.3d 676, 669-70 (Tenn. 2000).

First, we must determine whether the State had a duty to preserve the evidence. The question that immediately arises is whether a defendant must show that destroyed or missing evidence had an apparent exculpatory nature at the time it was lost or destroyed, or whether the duty arises if the absent evidence is merely potentially exculpatory.

In Ferguson, our supreme court looked to Arizona v. Youngblood, 488 U.S. 51 (1988), as the "leading federal case regarding the loss or destruction of evidence." Ferguson, 2 S.W.3d at 915. Both Ferguson and Youngblood dealt with the loss or destruction of potentially exculpatory evidence, not evidence that had an exculpatory value that was apparent at the time it was lost or destroyed. The Court in Youngblood concluded that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 58. In Ferguson, our supreme court rejected the bad faith requirement and the Youngblood analysis in its pure form because "proving bad faith on the part of the police would be, in the least, extremely difficult," and "the Youngblood analysis apparently permits no consideration of the materiality of the missing evidence or its effect on the defendant's case." Ferguson, 2 S.W.3d at 916. Instead, the court adopted a balancing approach and stated that the critical inquiry in determining the consequences that flow from the State's loss or destruction of evidence which the accused contends would be exculpatory is whether "a trial, conducted without the destroyed evidence, would be fundamentally fair?" Id. at 914.

The Ferguson court noted that the difficulty in determining the extent of the duty to preserve evidence as recognized in California v. Trombetta, 467 U.S. 479 (1984). In Trombetta, the United States Supreme Court said that the State's duty extended only to

-24-

"evidence that might be expected to play a significant role in the suspect's defense." Trombetta, 467 U.S. at 488. Trombetta said that in order for evidence to meet a constitutional materiality standard, it "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. at 488-89. Notwithstanding its consideration of Trombetta, the Ferguson court did not adopt its standard for constitutional materiality. Ferguson, 2 S.W.3d at 918. Rather, Ferguson imposed the duty on the State to preserve "potentially exculpatory evidence." Noting that the evidence in question "was probably of marginal exculpatory value," the court nevertheless said "it was at least 'material to the preparation of the defendant's defense' and might have led the jury to entertain a reasonable doubt about [the defendant's] guilt." Id. The court said that the State breached its duty to preserve the evidence and conducted the balancing analysis using the three factors we have noted above. See id. at 917.

Since Ferguson, the Tennessee Court of Criminal Appeals has looked on occasion to the Trombetta standard in determining if the State had a duty to preserve evidence which the accused contended was exculpatory, despite noting that the court in Ferguson only "seemingly cited with approval" the standard for constitutional materiality stated in Trombetta. See State v. Coulter, 67 S.W.3d 3, 54-55 (Tenn. Crim. App. 2001) (determining that the State had no duty to preserve the missing evidence because drawing a conclusion that it had any exculpatory value would be "an exercise in pure speculation"); see also State v. Ronnie D. Sims, No. M2004-02491-CCA-R3-CD, Davidson County, slip op. at 9 (Tenn. Crim. App. Nov. 22, 2005) ("The mere possibility of exculpatory content does not trigger a finding that the State failed in its general duty to preserve evidence under Ferguson."), perm. app. denied (Tenn. Mar. 30, 2006). In other cases, however, this court has said that the State had a duty to preserve evidence without finding that the evidence had apparent exculpatory value. See State v. Jeremy Keeton, No. M2009-01928-CCA-R3-CD, Wayne County (Tenn. Crim. App. June 26, 2012) (citing other unpublished decisions that considered the State's duty to preserve evidence without determining that the evidence had apparent exculpatory value); See State v. Lonnie T. Lawrence and Patrick D. Pickett, No. E2007-00114-CCA-R9-CD, Blount County, slip op. at 13 (Tenn. Crim. App. Mar. 17, 2008) (holding that although items seized from a methamphetamine laboratory may or may not have revealed fingerprints, the State had a duty to preserve the evidence that was not tainted or dangerous to collect and preserve because the evidence was "at least, material to the preparation of their defense"); State v. Thomas W. Cothran, No. M2005-00559-CCA-R3-CD, Hickman County, slip op. at 11 (Tenn. Crim. App. Nov. 29, 2005) (holding that the State had a duty to preserve a beer carton and beer cans found at the scene of a traffic accident involving an intoxicated driver, despite stating that the defendant failed to address adequately how the evidence would have been exculpatory), perm. app. denied (Tenn. May 1, 2006); State v. Sheri Lynn Cox, No. E2005-00240-CCA-R3-CD, Knox

County, slip op. at 4 (Tenn. Crim. App. Dec. 12, 2005) ("While the exact nature of the evidence, whether exculpatory or inculpatory, is unclear, the receipt books were, at the very least, material to the preparation of the appellee's defense. . . . Therefore, the State had the duty to preserve the evidence."); see also State v. Benjamin Hernandez, III, No. M2000-00225-CCA-R3-CD, Putnam County, slip op. at 7-9 (Tenn. Crim. App. Nov. 21, 2001) (stating that the State has a duty to preserve all evidence subject to discovery and inspection under Tennessee Rule of Criminal Procedure 16 and citing Ferguson, but omitting any reference to Trombetta or a need for the evidence to have an apparent exculpatory value before a duty to preserve the evidence arises).

We note the inherent difficulty a defendant may face in showing apparent exculpatory value of evidence that no longer exists. We believe that Ferguson should not be read to limit fundamental fairness inquiries only to cases where the defendant has established the apparent exculpatory value of the missing evidence at the time it was lost or destroyed. This court is bound, however, by our published decision in Coulter.

Considering the present case in light of Coulter, we conclude that the State had no duty to preserve an autopsy report. The members of this panel disagree whether the Defendant sufficiently established that an autopsy report existed. Although no direct proof shows that an autopsy report was prepared, the record reflects that Dr. Petrone examined the body and that biological samples were collected from the victim's brain, liver, bile, stomach contents, hair, and blood. Dr. Levy testified that a pathologist at Nashville General Hospital conducted autopsies for the medical examiner in 1975, that he had "no doubt" an autopsy was performed, and that it would have been standard practice at the time of the victim's death to prepare a report.

Despite our disagreement about the sufficiency of the Defendant's proof that an autopsy report existed, we agree that the Defendant has not shown the apparent exculpatory value of such a report. The Defendant challenged the State's theory that the victim's death was a homicide. Dr. Petrone classified the cause of death as asphyxiation and the manner of death as undetermined. According to the proof, Dr. Petrone was unable to eliminate the possibility that the victim choked on vomit. Dr. Levy testified, however, that this means of asphyxiation had later been scientifically disproved. There was evidence that samples were collected during the autopsy for toxicology studies, but no autopsy report could be found. The Defendant notes that the autopsy report probably contained information that would have supported Dr. Petrone's opinion, which was crucial to cross-examination of Dr. Levy. We note, however, that Dr. Levy testified that Dr. Petrone relied on a scientifically invalid premise. There is no indication that Dr. Petrone's classification of the manner of death as undetermined was based upon anything other than prevailing scientific belief at the time that

-26-

asphyxia could result from choking on vomit. There was no apparent exculpatory value to the purported contents of an autopsy report.

With regard to our disagreement with Coulter, we note that a more expansive view of Ferguson would not afford the Defendant relief. In addition to the scientific advances that eliminated the possibility that the victim choked on her own vomit, there was other, comparable evidence available to the defense. Dr. Levy testified that Dr. Petrone made statements to the press about his findings. The defense also had the death certificate, the toxicology report, photographs of the victim's body and the scene, police reports, and newspaper clippings available. The Defendant, further, cannot escape the other proof of his guilt. His semen and DNA were found on several items of evidence collected at the scene. He confessed to other inmates that he killed a female Vanderbilt student. The State presented evidence that the victim was a healthy nineteen-year-old woman. Although the toxicology results showed that the victim had alcohol in her system, Dr. Levy did not think it was a significant quantity. The toxicology results were negative for "drugs of abuse." The victim's vomiting could be explained by her alcohol consumption. There is nothing to suggest she was in poor health. There was significant evidence of the Defendant's guilt and an absence of any credible evidence that the victim died in a manner other than homicide.

The Defendant did not establish that he was denied due process relative to the lack of an autopsy report. The trial court did not err in denying the motion to dismiss. See Ferguson, 2 S.W.3d 912.

The remaining question is whether the trial court erred in denying a jury instruction regarding the absence of an autopsy report. In Ferguson, the court provided a sample jury instruction:

> The State has a duty to gather, preserve, and produce at trial evidence which may possess exculpatory value. Such evidence must be of a nature that the defendant would be unable to obtain comparable evidence through reasonably available means. The State has no duty to gather or indefinitely preserve evidence considered by a qualified person to have no exculpatory value, so that an as yet unknown defendant may later examine the evidence.

Id. at 918. The record does not support a conclusion that the Defendant was measurably disadvantaged by the absence of the autopsy report or that his trial was fundamentally unfair

without it. See id. at 918. No instruction was required. The trial court did not err and the Defendant is not entitled to relief.

## IV

## CHAIN OF CUSTODY

The Defendant contends that the trial court erred in admitting evidence from the victim's apartment, including DNA evidence, because the chain of custody was not sufficiently shown. The State argues that the Defendant waived the issue by failing to raise a contemporaneous objection and that in any event, the chain of custody was sufficiently proven. We hold that the Defendant waived the issue as to some of the evidence and that the trial court did not err in admitting other evidence.

We consider first the State's claim that the Defendant waived our consideration of the issue by failing to make an objection at the trial regarding the chain of custody for the items collected at the victim's apartment and the biological specimens collected during the investigation. The defense objected at trial to the chain of custody during Special Agent Johnson's testimony. The objection was, "I think this is a point at which they have not shown that . . . evidence that he received is necessarily the evidence that the case started with. More particularly not . . . that it's the same evidence, but they haven't shown the custody of control . . . over the past thirty-four years." The defense did not object earlier in the trial, however, when items collected at the scene were introduced as exhibits during Mr. Sledge's testimony or when Mr. Berwitz testified about the FBI's testing of the items. Although the defense contended at oral argument that the chain of custody was challenged in a pretrial hearing, the record contains transcripts of pretrial evidentiary hearings regarding admissibility of the Defendant's other crimes and acts but not litigation of the chain of custody of the evidence.

As a general principle, relief is not available to "a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." T.R.A.P. 36(a). Because the Defendant did not make a contemporaneous objection to admission of the evidence, he has waived any complaint about the chain of custody regarding the items themselves. See Tenn. R. Evid. 103(a)(1). Because he raised a contemporaneous objection to admission of evidence of the TBI's DNA analysis of the items, we will consider that issue.

The Tennessee Rules of Evidence provide, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its

proponent claims." Tenn. R. Evid. 901(a). If the facts and circumstances regarding the evidence "reasonably establish the identity and integrity of the evidence," it should be admitted. State v. Cannon, 254 S.W.3d 287, 296 (Tenn. 2008). If the State's proof of the chain of custody is lacking, then the evidence should not be admitted unless other appropriate means demonstrate the identity and integrity of the evidence. Id. In establishing the chain of custody, the State is not required to call as a witness every person who handled the evidence, or establish the identity of the evidence beyond all possibility of doubt, or to exclude every possibility of tampering. Id. On appeal, a trial court's ruling regarding the adequacy of the chain of custody is reviewed for abuse of discretion. Id. at 295.

Before Special Agent Johnson was permitted to testify about the DNA analysis, the trial court received proof at a jury-out hearing. Special Agent Johnson testified that the TBI laboratory was a secured facility. He said that an evidence technician received evidence from a law enforcement officer, sealed it, placed a sticker on it, and stored it in a separately secured vault within the facility. He said that when he received evidence for testing, it was taken from the vault and given to him at the evidence receiving window. He said that when he received the evidence, it was sealed, and that he resealed it before returning it to the evidence receiving window to be placed in the vault until a law enforcement officer claimed it. He identified his initials and tape on the packages containing a comforter, a pillow, a quilt, a striped bed sheet, a white bed sheet, a blouse, a pair of panties, the victim's fingernail clippings, and the Defendant's oral swabs.

On cross-examination, Special Agent Johnson testified that although he did not have personal knowledge of the identity of the person who brought the evidence to the laboratory, he was familiar with the standard operating procedures and had a report that stated who brought the evidence to the laboratory, the name of the technician who received it, and the name of the technician from whom he received it. On redirect examination, Special Agent Johnson said that each person in the laboratory had his or her own bar code that was scanned when evidence was transferred between individuals or the vault. He noted that the evidence technician printed her electronic chain of custody reflecting each time the evidence was transferred. The printout of the electronic chain of custody was received as an exhibit.

Other evidence presented during the trial included Mr. Sledge's testimony about collecting the evidence with Mr. Burke and the procedure they followed to secure the evidence. Mr. Sledge provided information about the police department's procedures for maintaining evidence securely. Mr. Berwitz testified about his own testing of the evidence and the FBI's protocols for handling evidence. Although Mr. Berwitz did not remember if he opened the package of evidence or if he packaged and returned the items to Nashville after the testing, he said that it was typically a technician's job to receive, package, and inventory the items. Agent Pridemore testified that the cold case had been reviewed by another officer

in 1992 but that no evidence was submitted at that time. Agent Pridemore said he submitted the evidence from the cold case file to the TBI laboratory for testing, although he acknowledged that he was unable to locate some hairs that were submitted to the FBI for testing and for which there was no record of their return.

At the trial, the defense argued that the trial court should not admit the evidence to the extent that some of it was transferred to the FBI before later being transferred to the TBI and the chain of custody had not been shown relative to the FBI. Noting that the State was not required to exclude any possibility of tampering, the trial court ruled that the evidence was admissible because the State had reasonably shown the identity and integrity of the evidence. The court also noted the lack of any proof of tampering or substitution.

Upon review, we hold that the Defendant has not demonstrated that the State's proof failed to adequately establish the chain of custody. There was no proof to suggest that tampering or incorrect handling occurred. The State was not required to call every witness who handled the evidence in order to establish a proper chain of custody. See Cannon, 254 S.W.3d at 296. When, as here, the State has demonstrated how the evidence was collected and stored securely and no suggestion of evidence tampering exists, a sufficient chain of custody has been established. The trial court did not abuse its discretion in admitting the evidence.

V

**SHELDON ANTER TESTIMONY**

The Defendant contends that the trial court erred in denying his motion in limine to exclude the testimony of Sheldon Anter, the jail inmate who testified about the Defendant's threat to kill another inmate and claim to have killed before. He argues that the statements were inadmissible under Tennessee Rules of Evidence 403 and 404(b). He also contends that the trial court erred in redacting information from the admitted statements. The State counters that the trial court did not abuse its discretion in admitting the evidence. We agree with the State.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Prejudicial evidence is not excluded as a matter of law. State v. Carruthers, 35 S.W.3d 516, 577 (Tenn. 2000) (citing State v. Gentry, 881 S.W.2d 1, 6 (Tenn. Crim. App. 1993)). The term "undue

prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Advisory Comm'n Notes).

When relevant evidence reflects on the defendant's character, however, the trial court must apply the more rigorous standard of Tennessee Rule of Evidence 404(b), rather than Rule 403. State v. James, 81 S.W.2d 751, 758 (Tenn. 2002); State v. Dubose, 953 S.W.2d 649, 655 (Tenn. 1997). Rule 404(b) prohibits evidence of other crimes, wrongs, or acts offered to show a character trait in order to prove that a defendant acted in conformity with that character trait. Tenn. R. Evid. 404(b). However, evidence of other crimes, wrongs, or acts may be admissible for other purposes, such as establishing identity, motive, common scheme or plan, intent, or absence of mistake. Id.; State v. McCary, 119 S.W.3d 226, 243 (Tenn. Crim. App. 2003). The rule lists four requirements that must be satisfied before a court determines admissibility:

> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issues, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1)-(4).

Hearsay is an out-of-court statement offered in court "to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). However, Tennessee Rule of Evidence 803(1.2), provides

> Hearsay Exceptions.-The following are not excluded by the hearsay rule:
>
> . . . .

-31-

> (1.2) Admission by Party-Opponent.-A statement offered against
> a party that is (A) the party's own statement in either an
> individual or a representative capacity . . . .

A defendant's statements, both written and oral, are admissible under this exception, subject only to exclusion under other rules of evidence. State v. Lewis, 235 S.W.3d 136, 145 (Tenn. 2007).

At the hearing on the Defendant's motion in limine, Sheldon Anter testified that he was convicted of worker's compensation fraud and was housed in the same jail pod as the Defendant. He recalled that the Defendant and Andrew Napper argued over changing the television channel. He said Mr. Napper went into the Defendant's room and said he wanted to fight. He said the Defendant stated, "[M]an, you better get out of my damn room before I kill you like I killed them four people."

Mr. Anter said he witnessed a later disagreement between the Defendant and Frank White on August 16 of an unspecified year. He said the Defendant told Mr. White, "[I'll] murder you like [I] murdered them four people," and that the Defendant went to Mr. White's room and said, "I'm gonna kill you like I killed them blue eyed b------." Mr. Anter said Mr. White pushed the Defendant on top of him.

Mr. Anter said he did not approach the police, although he spoke with them about a one week to one and one-half weeks later when they approached him. He said he was not promised anything for his testimony.

On cross-examination, Mr. Anter acknowledged that he had access to a television in his pod and that he saw news reports about the Defendant's case. He said his trial and sentencing had not yet occurred at the time of the incident involving Mr. White. On redirect examination, he said the incident involving Mr. Napper occurred in July of an unspecified year. On questioning by the court, Mr. Anter said that the Defendant did not specify the number of women he killed in the statement to Mr. White. On recross-examination, Mr. Anter acknowledged he did not initially report to the investigators that the Defendant said anything about "blue eyed b------" and said he was scared. He said that he gave four or five statements and that he told the officers he threw away his personal notes about the incidents. He acknowledged that he and Mr. White spoke about the Defendant and that Mr. White had information from the internet about the Defendant. He said Mr. White showed him the information from the internet after the August 16 incident.

The trial court considered first whether Tennessee Rule of Evidence 403 barred admission of the statements. The court found that the statements were admissions against

interest. The court found clear and convincing proof that the Defendant made the statements. The court found that the statements were probative because, if believed, the statements were proof of the material issue of the identity of the perpetrator of the victim's murder. The court also found that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. The court concluded that Rule 403 did not bar admission of the statements.

Next, the trial court considered the prior bad act aspects of the statements and admissibility under Rule 404(b). The court noted its previous findings of clear and convincing proof that the Defendant made the statements and of the material issue of identity of the perpetrator. The court found that the statement that the Defendant killed "blue-eyed b------" was relevant to the case on trial and "[i]t's not another bad act." The court said, however, that the Defendant's threat to kill the other inmate was evidence of a bad act other than the one on trial. The court also noted the potential for prejudice from the contextual evidence that the Defendant was in jail when he made the statement. The court found in this respect:

> [T]he fact that people were arguing in a jail over a television and the circumstances . . . is not unfairly prejudicial under 404(b) because it sets out the context in which the rest of that statement or the other part of that statement that is relevant to the case was made. And, without it, it just wouldn't make any sense to the jury. . . .
>
> I do think there are material issues to set into context the argument and the rest of the story in terms of the statements that were made at the same time, in the same sentence with those other . . . threat in terms of I will kill you because I have killed four people before, or you better listen to me because I've done this before.

The court noted the danger of unfair prejudice due to the mention of multiple victims in the Defendant's statements that he would kill another inmate like he killed four other people. The court ruled that in order to preserve the Defendant's right to a fair trial, these statements would be admissible if redacted to include information that the Defendant had killed before but not that there were multiple victims. The court found that this reduced the prejudice and did not materially alter that substance of the statements. The court found, however, that evidence of the Defendant's statement that he would kill the other person like he killed the "blue eyed b------" was inadmissible because it could not be redacted without changing the meaning or rendering it overly prejudicial.

The trial court considered the issue again before Mr. Anter's testimony at the trial. Mr. Anter was questioned about his claim that the Defendant made a statement about having killed a Vanderbilt student. Mr. Anter conceded that he first told officers that the Defendant claimed to have killed a TSU or MTSU student. Mr. Anter said that when he was being escorted back to his cell after the interview, he recalled that the Defendant claimed to have killed a Vanderbilt student. Mr. Anter also testified that the Defendant threatened his life about one week later if Mr. Anter revealed the Defendant's previous statement. The court found clear and convincing proof that the Defendant made the statement. The court noted that the threat was corroborative of the initial statement of having killed a Vanderbilt student and that the evidence pertained to an issue other than of the Defendant's character, as stated in the previous ruling.

The first question we must answer is whether Mr. Anter's testimony that the Defendant had killed before was subject to the general bar of evidence of a defendant's other crimes, wrongs, or acts as contemplated by Rule 404(b). The evidence was offered to show that the Defendant admitted killing the victim of the charged crime. Rule 404(b) addresses evidence of a Defendant's crimes other than the one on trial. Had the trial court admitted evidence of the Defendant's admissions of multiple killings, Rule 404(b) would apply, but because it did not, Rule 404(b) did not apply. We note that the evidence was admissible as an admission of a party opponent under Rule 803(1.2).

We next consider next whether the evidence was barred by the limits of Rules 401 and 403. Contrary to the Defendant's assertion, the evidence was relevant and material. It was the Defendant's admission that he killed the victim, a Vanderbilt student. Whether he killed the victim was the most basic issue in the case. See Tenn. R. Evid. 401. The evidence was prejudicial in that it indicated the Defendant's guilt, but it was not unfairly prejudicial given its relevance to the case. While we acknowledge that the statements also contained the Defendant's threat to kill fellow inmates, we note that the trial court limited any prejudice in this respect by instructing the jury that this evidence could not be used against the Defendant in determining the issues in the present case. The probative value of the evidence was high, and it was not substantially outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 403. The court did not abuse its discretion in admitting the evidence.

Regarding the Defendant's contention that the trial court erred in admitting the statements in a redacted form, he argues only that it was improper to admit redacted statements rather than exclude the evidence altogether. Based upon our holding that the statements were properly admitted, this argument must fail. The Defendant is not entitled to relief.

## PHOTOGRAPHS

The Defendant contends that the trial court erred in admitting "altered" photographs. The State responds that the photographs were originals, that they were not altered, and that they were properly admitted. We agree with the State.

At the trial, the State offered photograph exhibits of the victim and the crime scene. The photographs were taken in 1975 using film, and prints were made at that time. Shortly before the 2009 trial, the State had the photographs reprinted using modern equipment, which produced photographs with different colors and higher definition. The defense objected on the basis that the 1975 photographs were the best evidence. The defense argued that the victim's injuries appeared fundamentally different in the reprinted photographs. The State countered that the original photographs were faded and that the new photographs were merely reprinted from the original negatives, not enhanced, using modern equipment.

In a jury-out hearing, Mr. Sledge testified that the photographs were printed using modern technology. He compared the 1975 photographs with the reprints. He said that no differences were in "the actual picture" but that the reprinted photographs were more colorful and vivid. He said the reprints were more reflective of his recollection of the crime scene than the 1975 ones. He said that the 1975 photographs would have been stored over the years and that the police department photography laboratory "had the cheapest paper when they printed these in '75." On cross-examination, he agreed that the photographs printed in 1975 were accurate. He agreed the reprints were "brighter" than the old ones. He said he first saw the 1975 photographs in Fall 2008 and agreed that they were accurate in the content they depicted. He said the reprints were an accurate depiction of what he saw but were more vivid. He conceded that he was not familiar with the developing process used to produce the new photographs.

The trial court reviewed the six photographs. The court found that the photographs were reprints and that the best evidence rule was not an issue. The court noted that the victim's manner of death and whether the death was a homicide were at issue. The court found that the photographs had probative value because they would assist the jury to see the victim's injuries and the scene better and that the probative value was not outweighed by the danger of unfair prejudice.

Tennessee Rule of Evidence 1002 generally requires that original photographs be used as exhibits. "A duplicate is admissible to the same extent as an original unless a genuine

question is raised as to the authenticity of the original." Tenn. R. Evid. 1003. "An 'original' of a photograph includes the negative or any print." Tenn. R. Evid. 1001(3).

The Defendant contends that the photographs were not admissible under Tennessee Rule of Evidence 1001(4), pertaining to duplicates, because they were not accurate reproductions of the originals due to their enhanced coloring. We begin by noting that two prints of each photograph in question, both a 1975 print and a modern print, were admitted. In any event, both sets of the photographs were "originals" under Rule 1001(3). Both were printed from the same negative and were "any print" as contemplated by that rule. See Tenn. R. Evid. 1001(3). We note that despite reference to production of a duplicate "by means of photography" in Rule 1001(4), the Advisory Commission Comments to Rule 1001 reflect that the primary target of the Rule is photocopies. The Comments state that "duplicate . . . encompasses the copies familiar to all lawyers with copy machines." Tenn. R. Evid. 1001(4), Advisory Comm'n Cmts. We note that the photographs were not enhanced by computer or other means, but they were merely printed from the negatives using modern equipment. That the modern equipment produced more colorful and vivid photographs does not mean that the photographs were misleading. Likewise, it does not mean that the photographs were unfairly prejudicial. See Tenn. R. Evid. 403. Mr. Sledge testified that both sets of photographs accurately represented the scene and the victim as he observed them on February 2, 1975. The Defendant is not entitled to relief.

# VII

## OTHER CRIMES EVIDENCE

The Defendant contends that the trial court limited his ability to present a defense by failing to rule definitively that evidence of his other crimes was not admissible pursuant to Tennessee Rule of Evidence 404(b). The State counters that the Defendant's constitutional right to present a defense was not violated. We agree with the State.

In a pretrial hearing, the trial court considered evidence the State sought to offer at trial regarding other alleged incidents involving the Defendant's attacking two women in their homes and attempting to break into a third woman's home. The proof included evidence that during the investigation of an alleged rape involving a fourth victim, an officer found a knife, gloves, and a bandana at the Defendant's home and that items such as these were used in the alleged incidents. The proof also included testimony that a former police officer apprehended the Defendant at the scene of the attempted break-in and that the Defendant was wearing a tweed coat, ski mask, and two pairs of gloves. The trial court filed a twenty-three page order in which it ruled preliminarily that the evidence was not admissible during the State's case-in-chief but that "[u]pon proper motion, the Court will re-examine the

admissibility of the evidence if and when additional trial testimony varies from the testimony offered at the motion hearing in terms of its evidentiary value." The court made the following detailed observations regarding the possibility it might later change its ruling:

> If additional evidence is presented at trial that create conceptual or contextual voids, the Court will not hesitate, on proper motion, to re-examine the proposed evidence[.]
>
> . . .
>
> If the State presented evidence of defendant's DNA at trial, the jury has within its purview to accredit or discount the DNA evidence as it sees appropriate. In the event other testimony is presented or elicited to challenge the DNA evidence and create an inference that the defendant is not the person who committed the crime or was not even at the scene, the Court finds it appropriate to revisit the admissibility of the subject testimony. At that time it is possible the balance could be tipped in a different direction.
>
> . . .
>
> Assuming [without the benefit of the trial evidence that] the proposed evidence has some probative value on the issue of motive and intent, the Court must also weigh the probative value against the danger of unfair prejudice. Allowing this evidence to be introduced in the State's case-in-chief without question creates danger of unfair prejudice, which, at this time, outweighs any potential probative value.
>
> Once the trial testimony is underway, the parties may move the Court to re-evaluate the proposed testimony in light of evidentiary developments which would tend to make the probative value greater in the Rule 404(b) balancing test.
>
> . . .
>
> It is the Court's obligation to ensure that inadmissible propensity evidence . . . does not taint the trial of this case and possibly result in a conviction based not on the evidence relating

to the instant case but upon substantial evidence of other crimes for which he is not currently on trial. Assessing the information known to the Court at this time, the proposed evidence has some probative value on the material issues enumerated by the State. However, at this time the Court must conclude that the danger of unfair prejudice outweighs the probative value.

The Court is mindful that a Rule 404(b) inquiry is preliminary by its very nature. The trial has not begun and no witnesses have been called. Therefore, it is possible that evidence could develop through questioning at trial which could open the door to some or all of the requested evidence.

. . .

Once the trial begins the State may ask to revisit these issues depending on the development of the proof.

During the State's case-in-chief, the prosecutor requested that the court revisit the admissibility of evidence of other sexual assaults that were attributed to the Defendant, at least one of which the Defendant confessed to committing. The trial court stated that it was of the opinion that the evidence was not admissible but that it did not yet know what evidence the Defendant might offer.

On appeal, the Defendant argues that he was deprived of a fair trial due to the uncertainty that the trial court might change its ruling, even though he "is unable to conceive of any scenario . . . in which the unfair prejudice created by [the evidence] would have outweighed the probative value[.]" The Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). In that vein, "The Sixth Amendment and the Due Process Clause of the Fourteenth Amendment clearly guarantee a criminal defendant the right to present a defense which includes the right to present witnesses favorable to the defense." State v. Brown, 29 S.W.3d 427, 432 (Tenn. 2000); see Chambers v. Mississippi, 410 U.S. 284, 302 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense.").

Our supreme court has said, "With a few exceptions, see, e.g., Tenn. R. Evid. 608 and 609, the trial court is given broad discretion in the timing of its decisions on the admissibility of evidence." State v. Caughron, 855 S.W.2d 526, 541 (Tenn. 1993). Likewise, the trial

court is afforded broad discretion to direct the course and conduct of the trial. Id. "Any competent evidence which explains or directly applies to evidence introduced by the accused is admissible in rebuttal." State v. Brock, 327 S.W.2d 645, 701 (Tenn. Crim. App. 2009) (citing State v. Thompson, 43 S.W.3d 516, 524 (Tenn. Crim. App. 2000)). The State is allowed to present rebuttal proof because it "does not and cannot know what evidence the defense will use until it is presented at trial." Id. (internal quotations omitted). Whether rebuttal testimony will be allowed and its scope if allowed is within the trial court's discretion. State v. Reid, 213 S.W.3d 792, 831 (Tenn. 2006).

In essence, the Defendant seeks a ruling that would allow him to present his defense with impunity and would prevent the State from offering rebuttal proof, even if relevant evidence existed. We are not prepared to rule in this manner. See State v. Gilley, 173 S.W.3d 1, 6 (Tenn. 2005) (noting that a ruling on the admissibility of Rule 404(b) evidence requires consideration of the trial evidence and that any pretrial rulings may warrant further consideration based upon the trial evidence presented). We note that the trial court did not prevent the defense from calling any witnesses, including the Defendant. The court ruled that depending on the nature of the defense proof, the State might be allowed to present evidence that the court had barred from the State's case-in-chief. We fail to see how the Defendant was prevented from presenting a defense or how he was deprived of his right to a fair trial. The Defendant is not entitled to relief.

## VIII

### EXPERT SERVICES

The Defendant contends that the trial court erred in denying the defense motion for expert services to assist in the motion for new trial. He states in his brief, "The bas[i]s for this ground is being filed ex parte and under seal[.]" The State has not responded, due to the sealed nature of the record regarding this issue. On March 14, 2011, this court filed an order which stated in pertinent part:

> The Appellant's request for ex parte appellate review of the trial court's ruling on the funding for expert services . . . is denied. Neither the statutes of this State, the Rules of Appellate Procedure, nor prior case law provide for such review. Furthermore, the absence of any provision in Section 5 of Supreme Court Rule 13 for an ex parte review on appeal of a trial court's ruling regarding expert services leads this Court to the conclusion that such a procedure is not specifically contemplated by the Supreme Court.

State v. Jerome Sidney Barrett, No. M2010-00444-CCA-R3-CD, Davidson County (Tenn. Crim. App. Mar. 11, 2011) (order). We adhere to this court's previous order denying review of the issue.

## IX

## CUMULATIVE ERROR

Finally, the Defendant contends that his due process rights were violated by the cumulative effect of the errors. Because we remain unpersuaded that error occurred, this issue is without merit.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE